09-1233, Schwarzenegger v. Plata, and the related cases. Mr. Phillips? Thank you, Mr. Chief Justice, and may it please the Court. What this Court has under review today is an extraordinary and unprecedented order issued by a three-judge district court requiring the release of between 36,000 and 45,000 inmates currently incarcerated in the California penal system within a two-year period. The order in this particular case is made particularly remarkable because it strikes me that at a minimum it is extraordinarily premature, that it may come at some point in this process that an order probably substantially smaller in scope than this one may become appropriate. But if this is supposed to be an order or a remedy of last resort, what the district court has done here is leapfrogged a series of steps that should have been taken ahead of going this particular route. One case, Mr. Phillips, is pending for 20 years, is that not so? Yes, that's correct, Justice Ginsburg. So it seems to me, and there was something like 70 orders from the district court, the single-judge district court in that case. That's absolutely true, Justice Ginsburg. And no change, so how much longer do we have to wait, another 20 years? No, Justice Ginsburg, I think obviously the length of time you have to wait in some ways depends on what the state of the remedial phase is in a particular case. And in this case, and in recognition, frankly, of the substantial problems that were inherent in the penal system as it existed during the 1990s and up until the early 2000s, a receiver was appointed, specifically in the Plata class, but there was also connections between the receiver and the special master even in the Coleman class before the three-judge panel was convened. And under those circumstances, and given the extraordinary powers that the receiver had been accorded, what should have the most logical course, if this is supposed to be a remedy of last resort, was to allow the receiver an opportunity to implement the extraordinary powers that were conferred upon him and then see, because if it turns out that we aren't making progress. Excuse me. Could you tell me, from your briefs, I just haven't understood what the alternative steps are. The court below talked about some proposals, like construction, and said the legislature has struck them down. The fiscal crisis has gotten worse, so construction is really not an option. I don't see how you wait for an option that doesn't exist. They talked about hiring more staff, but the conclusion was that even if you maximize the staff, you don't have the facilities to add more staff, which is what you need to cure the constitutional violation. So tell me what specific steps outside of this order should have been given time to be implemented, because the receiver has basically said, I've tried, and the small progress we made has been reversed, because the population just keeps growing, so we can never get ahead of the problem. So slow down from the rhetoric and give me concrete details about what the least restrictive means would have been, other than to say, throw it back to a receiver and special master who are saying we don't have a solution. I don't think that's a fair characterization of what the receiver said. The receiver said that at any population, he would, in fact, get you to the point. Counsel, that was one statement years ago. If that's all you're relying on, that may be the weakest argument. Tell me, give me concrete steps that are at least less restrictive. Well, all you have to do is look at what the receiver has done over the course of the period of time since his appointment, and particularly when the second receiver was put in place. First of all, AB 900 has been enacted. There is significant construction. There has been ground broken. There are substantial facilities in place. Second, the receiver has had extraordinary success in the hiring process. We are close to 90%. We are, in fact, less overcrowding because I thought that what this case was all about was the receiver has said, the special master has said, we can't make any progress at all until there are fewer people. We have no place to put clinics. The first step, not the last step, but given what we're dealing with here, the potential first step is that we have fewer people so there is more room for these health facilities, more room for staff to operate. Justice Ginsburg, the fundamental issue in this case seems to me is what is the real cause of the constitutional violation here? And the real cause of the constitutional violation here has always been the culture of disregard for the inmates. What the receiver was put in place for, the reason he was appointed and properly so, this was with the state's consent, this is not over our objection, was to change that fundamental culture and to provide, one, construction, to provide increased numbers. But you can't provide construction when the state doesn't supply the money for it. Except that since the August 8, 2008 period of time, literally hundreds of millions of dollars have gone to construction specifically and more than $4 billion have been spent on the provision of health care in this particular system. And a great deal of that is because of the receiver. If there are these great changes in circumstances so that now the medical care can be administered in something approaching a decent level, you could go back to the single judge district court and say I'm moving on to 60B. Circumstances have changed. It's no longer the case that it's impossible to render decent health care. Justice Ginsburg, I don't think we could get that relief from the single judge district court unless you're asking me to actually seek to remove the entirety of the claim. I mean, the order that says that we have to get to 137.5 percent of the design capacity within two years is a three-judge district court decision. You can't go back to that panel because it invited you to. It said if circumstances change, come back. But that will always be the case, Justice Sotomayor. The fundamental question here is Congress shifted dramatically the approach that you're supposed to take as a court of equity in this context. This is supposed to be a matter of last resort, which would mean that you would give the receiver a full opportunity to do what the receiver has to do. The receiver said the best statement, it seemed to me to summarize it, is in his brief on page 9. He has about two paragraphs, and as you read that two paragraphs, it sounds as if overcrowding is a big, big cause of this problem, which is horrendous, which if you think it's accurately described in the mental case in the first page two paragraphs. Now, if that's a fair description from the record, it's a horrendous problem. What the receiver says is overcrowding is a big cause of it, and then he says, I think we've discovered you actually can provide care, and certainly our plan and turnaround plan believes we can provide constitutional levels of care no matter what the population is. So then you look to the care and turnaround plan, and it says spend $8 billion building more buildings, and then the legislature rejected it. Okay? Now, there we are. More time, what's supposed to happen? No, but Justice Breyer, the legislature also approved a smaller but nevertheless multi-billion dollar construction. It was 2.31 or something like that. And did they approve the 2.3? Is that in place? 2.35. Did they approve that? Yes, they did approve that. Okay. So he said we need 8, we need 8, and they approved 2.35. Right, and the receiver hit the button. Is there any evidence here that suggests that 2.35 is sufficient to cure the constitutional violation? Well, I don't know whether it will get you there or not. I take it from your answer the answer is no, there is no evidence. Well, there is the evidence that the receiver asked for contempt for not getting the 8 billion and withdrew that motion. So obviously there is some sense in which the receiver is reasonably satisfied with 2.35 billion as an opening gambit. But, again, all of this goes to what is, at least from my perspective, the fundamental question the court should have evaluated in the first instance, which is are we ready yet to give up hope at this point? Well, what he says, what the receiver says about the 2.35, that it is a significant step farther. It is certainly better than no construction at all. However, that is not equivalent to a conclusion that that current compromise will result in sustainable constitutional health care at current population density levels. That's what he said about it. So we have his views, and I'm back to my question. What else is supposed to happen? Which was your question? Justice Breyer, when the receiver says that, now, remember, he says at current population levels. He doesn't suggest, and his brief is very clear, that it doesn't urge this Court to affirm the particular order in this case. Can I just finish this? And the reality is that the population levels have dropped pretty significantly since August, since the trial in this particular case, and given the actions by the legislature in AB 18, actions of the legislature in AB 900, there are both a lot of expenditures on the table and substantial reductions in the population size. And so, therefore, even under the receivers — But do we have information about that substantial reduction? I mean, in this record, it just seems to be that no matter how many efforts have been made, the population goes up. And now you say that the population has gone down. From what point in time and how much has it gone down? Well, it's down to around, as I understand it, about 147,000, up from a high of around 165,000 to 170,000. And it has dropped, as we know, because there's been a change in the good time credits. There's been a significant number of transfers. I mean, that was the purpose of the governor's proclamation. So it's possible that within the two-year period, you're going to hit the mark. I think it's unlikely. That's what the three-judge panel said, which is if you implement most of the proposals being made, you are likely to hit the mark. So what you're saying is you're going to do it. And if you don't, they invited you to come back. And you really don't think that if you hit 140 percentage that the court is going to order an immediate release of the 2.5 percent over the limited set. It's going to ask you what have you put into place to reach that level over what additional period of time. I mean, there's a core sort of federalism answer and then a basic sort of factual point to be made here. Let me make the second one first, and then I want to come back to what you may regard as rhetorical but nevertheless I think important, which is that when we made our initial proposal to the three-judge court suggesting what we thought would be a reasonable reduction within a reasonable period of time, it was met with both a motion for contempt and summary rejection out of hand, notwithstanding the improvement in time. Are we fighting about that the plan was wrong or are we fighting about that you're angry that you were told to do it in two years, in 22 years, as opposed to do it in 25 years? Is that what you're objecting to? No, this goes to the federalism point. Can you do it in five years? I don't know. If balancing all of the policies that the state has to take into account, can it get there and is that in the best interest of the state of California? If it is, yes. Well, the best interest of the state of California isn't it to deliver adequate constitutional care to the people that it incarcerates. That's a constitutional obligation. Absolutely. And California recognizes that. So when are you going to get to that? When are you going to avoid the needless deaths that were reported in this record? When are you going to avoid or get around people sitting in their fiches for days in a dazed state? When are you going to get to a point where you're going to deliver care that's going to be adequate? Don't be rhetorical. I'll do my best. Thank you, Your Honor. I mean, first of all, if you look at the receiver's 2009 death review, which came out in September 2010, specifically says that there's been a significant downward trend over the past four years. The 25 suicides in 2009 were 66 percent of the average for the preceding three years, and the nine homicides were 60 percent of the average. There have been significant improvements. And the more important point in response to your specific question, Justice Sotomayor, is that the record in this case was cut off in August of 2008. And so what we have are— The constitutional violation still persists, as the State itself acknowledges. Well, I'm not sure we would say that. Overcrowding is the principal cause, as experts have testified, and it's now time for a remedy. The Court can't—has to at some point focus on the remedy, and that's what it did, and that seemed to me was a perfectly reasonable decision. Justice Kennedy, I agree with everything you say, and I even agree with the last statement, because, you know, you needed a significant remedy. There's no question about it. But you got a significant remedy when the receiver was appointed in 2005 and implemented a program in 2006. How much time do you think the receiver needed? I mean, how much time should the Court have given the receiver to develop his plan and to try to implement his plan? Well, there's no—Justice Kennedy, there's no specific time frame. I mean, obviously, we believe that we're entitled to a reasonable opportunity to comply with the receiver's orders and to bring ourselves ultimately into compliance with the Constitution. Well, at some point, the State itself said that if it had, I think, seven years, it could get down to 137.5 and didn't seem to object to that. No, that's—Justice Kennedy, you know, given all of the other constraints, et cetera, again, there's a fundamental difference between what you do under the hammer of a district court order, which is what we have under these circumstances, and what the State will do. That said, the State is absolutely committed. I mean, again, to go back to what is the root cause of the constitutional violation, it's not overcrowding. I mean, when California violated the constitutional rights of the mentally ill in the 1990s, the prisons weren't crowded. It was because there was a fundamental lack of attentiveness to medical care under those circumstances. And that's unfortunate, to be sure, more than that. But that was the reason—to go back to your point, Justice Kennedy—that's why the receiver, which is an extraordinary remedy, to confer upon a private individual the entire authority to run the California Department of Corrections, not just simply a facility or anything like that, but the entire Department of Corrections medical health provision is incredible. But I thought that officer himself said, I can't do this without, as a first step, reducing the population. Nothing else is going to work until we reduce the population to the point where there is room for clinics, room for medical personnel to operate. I mean, that was the view of the district judge, the special master in one case, the receiver in the other case, everybody, and they all agreed. Reducing the population is not going to cure it. It's not going to make everything perfect. But without doing that as a first step, nothing, there will be no cure. Well, Justice Ginsburg, even if you accept that, and I don't think that's precisely how I would interpret what the receiver said under these circumstances anyway, but even if you accept that, the idea of a 137.5% design cap that has to be implemented within fewer than two years is a remedy that's neither necessary nor sufficient. It is not aimed at the specific class. It doesn't remedy the specific federal rights as required by the Prisoner's Litigation Reform Act. I don't get the question because what, if you can't have a remedy just limited to the class, the class wants to have clinics. They want to have personnel who function someplace outside of a boom closet. So you can't deal with this problem by just dealing with the mentally ill and the people with medical problems. You have to provide space for facilities. I think, Justice Ginsburg, the fundamental point here is that it may eventually be that you have to get to that stage. But if you look at the receiver's report since August 2008, which consistently analyzed this issue, and they say, and we've been able successfully to bring in very qualified personnel, and we have significantly larger numbers, we know there is construction in place. It may not be as substantial as what I originally proposed. It is, nevertheless, very significant. And Congress was very explicit that the remedy of a prisoner release order should be the remedy of a consular release order. Well, when I look at this, it's a big record. What I did was, it refers to online evidence. And I went and looked at the pictures. And the pictures are pretty horrendous to me. And I would say page 10 of the religious group's brief, for example, shows you one of them. And what they're saying is, it's obvious. Just look at it. You cannot have mental health facilities that will stop people from killing themselves. And you cannot have medical facilities that will stop staph and tubercular infection in conditions like this. And then you look at them. And you've looked at them. I've looked at them. And what is the answer to that? There's nothing in here that the special master said. $8 billion is the answer. And they haven't come close. So how can I, or you if you were in my position, what would you say in an opinion that says that these three judges who have 200 pages of findings, what would you say as an answer to what I just said? I would say that the Prisoners Litigation Reform Act has a series of very specific requirements that the federal court has to comply with. And in deciding to go to a three-judge district court in the first instance, you have to examine the orders that are in place and whether those orders have had a reasonable time within which to operate. Yes, but the state did not claim that either order in either case has succeeded in achieving a remedy. You've never claimed that. Well, it depends on what you mean. And just while I have your attention for a moment, I have this problem with the case. Overcrowding is, of course, always the cause. If I'm running a hotel, if I'm looking at a highway system, I need to know what's the number of cars. The problem of bad service in a hotel, well, it's the number of employees per guest. I mean, that's fairly simple. Now, I recognize, of course, that Congress has imposed a special duty on us, but I think it means that overcrowding must not be ordered unless that is the only efficacious remedy in a permissible period of time. And it seems to me there's massive expert testimony to support that proposition on the part of the prisoners. I mean, it seems to me that, first of all, I'm not sure that's consistent with the language. It's the primary cause of the constitutional violation, not the primary impediment to the implementation of a specific remedy. So I think that's still a difficult and open question as to how to proceed, but it still strikes me that the sequence that Congress envisions and the one that would make the most sense and ultimately the one that hopefully would accommodate both the plaintiff's interests and the state's interests and the Department of Corrections' interests is to allow the receiver to stay on a course that candidly, I think, will, in fact, get you there. I mean, again, one of the real flaws in this case, Justice Kennedy, is nobody doubts for a moment that there have been very significant violations of constitutional rights years gone by, and indeed a failure on the mental health side ultimately to get to the point where we are, in fact, providing a significant remedy. The reality is that in the course of the last three to four years, under the guidance of the receiver, who coordinates with the special master on the mental health side and does it with the cooperation of the state of California, there has been significant movement in the right direction. And if the court had not jumped the gun and said, look, we're not going to let that part play itself out, we are going to leap ahead and go to a three-judge court and go to the prisoner release order, this process would have played itself out and we wouldn't be here right now. All this talk about what the receiver may think can be done seems a little bit perplexing to me because the receiver did not testify before the three-judge court. Isn't that correct? That's true. We were not allowed to question him. We were not allowed to question him. So now he's submitted what is styled an amicus brief where he doesn't address issues of law. He explains his views about – he tries to explain prior statements and supplement those prior statements. Is that proper? Well, you know, I'm a long-time believer that amicus briefs pretty much open seated in terms of anything you want to present on them. But, I mean, obviously, I think that's clearly a better system. Can a witness testify? Can a witness submit an amicus brief that consists of an affidavit? No, Your Honor. It's obviously not appropriate. And, Phyllis, one of the things that came out – I thought that brief was filed because there were – in your presentations there were representations about the special master and he filed that brief to say you must understand this in context. I was making a speech at the conference. So he wanted to put in context what you had used. You had quoted his statement. Well, to be sure, although, candidly, we had referred to some of those same statements even in the jurisdictional statement in this litigation. This has been part of the case for quite some time. So I don't know what motivated the special master to file an out-of-time brief – or, I mean, the receiver to file an out-of-time brief, but I understand. But, you know, we didn't object to it so long as the Court was of the mind to hear from the receiver. But I do think the most important part of that, though, to keep in mind in this context, is the receiver didn't ask for this Court to affirm. The receiver simply clarified certain statements that had been made and tried to say, as Justice Alito described, put them into some kind of context. And that's fine. And we obviously don't have any quarrel with that particular presentation. But I do think to say that the receiver has insisted that he cannot get to a constitutionally permissible result without the order that's been imposed in this particular case is simply not consistent with either the record and certainly not consistent with that amicus. Well, but the experts testified to that effect. I mean, experts made – certainly reached that specific conclusion. But this Court has recognized – And the strike force and the Governor's Commission reached the same conclusion? The strike team, I think they call them. Right. But, again, it seems to me there's a very, very big difference between what do you need to accomplish in order to remedy whatever the constitutional violation is, recognizing in the first instance that the biggest element of an Eighth Amendment violation is the deliberate indifference prong, which absolutely seems to me to have been completely eliminated by the conduct of the State over the course of the last three to four years. There is no evidence. But what specifically will happen? I mean, at the moment, you know, we could go through – we have all these briefs. I mean, there are all these experts, all the reports. Everybody is saying you need to spend the money. And we have, if you really want to cure the constitutional violation, we have the legislature rejecting $8 billion but two, which does 2.35. And so – and nothing. And a void. And give us more time. I mean, I read the newspaper. It doesn't seem to me California has been voting a lot of money for new programs. What is it specifically that would happen that would cure this problem? Were we to say – I mean, a big human rights problem. What would we say? What would happen if we were to say, no, this panel is wrong? What would happen that would cure the problem? Well, it depends, I suppose, in some ways on how you – A constitutional problem which the state itself admits is constitutional. A state with a governor who said publicly that there is this tremendous safety and health problem in the prisons. What would happen? Well, if the court were to conclude that the three-judge panel shouldn't have been convened, that would be one outcome. If the court concludes that it was appropriate to convene it but 137.5 percent is not narrowly tailored, it would be a different one. Either way, it will go back, obviously, to a court of equity. The receiver is in place. The receiver has a comprehensive plan in place which he is implementing as we speak. One piece of it, you said something about the $2.35 million. They didn't come up with the $8 million, but they did come up with $2.35 billion. And then I'm just looking at this brief for the receiver. And there's a footnote, page 11, footnote 3, that says, no, that money isn't there. It's dependent upon several approvals that have not yet been secured, and such approvals ultimately may not be forthcoming. Well, I mean, $400 million of it has already been spent. The rest of it has already been earmarked for this particular purpose, and the expectation from the State of California is that money is going forward. Construction is, as we speak, underway. And the one thing we do know is the time the receiver asked for a check. I mean, I think you did say earlier that this was a done deal, $2.35 billion, but this is a note telling us it's not so. Well, the receiver is saying it's not etched in stone. I understand that. But our assumption and our expectation and our belief is that that money is going to be used for construction. There are projects that are finished. There are projects that are underway. And there are projects that are scheduled to begin within the next six weeks, all of which will be funded out of that $2.35 billion. And one project that the Joint Legislative Budget Committee said no, they're not going to give you the money for that. They asked for additional information, to be sure. But the expectation, again, from the governor, both this governor and the governor-elect, is that that money will ultimately be approved and that that facility will be built. And we're moving along very rapidly to get that construction underway, because we're talking about enormous facilities under these particular circumstances. Mr. Phillips, my trouble listening to you is that it seems as though you're asking us to refine facts. You know, you have these judges who have been involved in these cases since the beginning, for 20 years in the Vada case, who thought we've done everything we can. The receiver has done everything he can. This just isn't going anywhere, and it won't go anywhere, until we can address this root cause of the problem. And that was the view of the judges who had been closest to the cases from the beginning and the view of the three-judge court generally. So how can we reach a result essentially without, you know, refinding the facts that they've been dealing with for 20 years? The fundamental problem with the fact-finding in this case, well, there are actually two fundamental problems. First of all, remember that the receiver gets appointed, and then three months later you get a motion for a three-judge court. The three-judge court convenes itself before the receiver has even finalized the comprehensive plan to bring everybody into compliance in the first instance. So the reality is that's the fundamental legal error I'm asking this court to correct. But even if you get beyond that and you're looking at the primary cause analysis, it seems to me that's at best a mixed question of law and fact. And it's the kind of standard that this court ought to analyze to determine in the first instance and on an independent review whether or not the overcrowding is, quote, the primary cause of the violation. And what makes that inquiry particularly appropriate for this court as opposed to simply slavishly deferring to the district court in this circumstance is that the district court arbitrarily cut off the record. And there have been enormous developments since then, and there were enormous developments. Can you explain something about that? It was confusing in the brief, Mr. Phillips. I thought that the state had said, we don't want the plaintiffs to tour these facilities anymore. We don't want to have discovery go beyond what it was some date in 2008. I thought that it was the state that was urging, we don't need any more discovery. We don't want any more inspection tours. So how could the plaintiffs submit more than they did when the state said, it's enough. 2008 should be the cutoff. Well, there's a huge difference between not allowing formal tours and all of the rigmarole that goes with that, which is what the state specifically objected to. But what the state wanted to do and what the interveners on our side and even greater vehemence wanted to do was to bring forward evidence that proved that in the interim period of time there have been, in fact, significant improvements. As I sit here today, Justice Kennedy, you said it's conceded that we are in constitutional violation. It is conceded that we have been in constitutional violation. I don't know whether today we are in violation. But then doesn't that have the burden, if you have, you concede that you have been in constitutional violation, then it seems to me you have the burden of showing that's no longer the case. That's generally so in the... Counsel, did you have a comment that maybe... I'm sorry. Could you answer Justice Ginsburg's question first? Justice Ginsburg, I understand what the ordinary rule would be in a court of equity dealing with a constitutional violation. But we're talking about an order entered under the Prisoner's Litigation Reform Act. And it's quite clear that the statute couldn't be any plainer, that it shifts the burden significantly onto the plaintiff when you are going to go for a remedy as extreme as insisting that somewhere between potentially 36,000 and 45,000 inmates be released within a two-year period of time. Again, I could go back. You know, the receiver has not... At the time that all of this took place, the receiver had been appointed. The receiver had devised a plan. The receiver is currently spending an enormous amount of money, $4 billion on health care, to get the system moving in the right direction with the right attitude in order to bring ourselves without question into constitutional compliance. The truth is we haven't really had an assessment of where we are in the constitutional compliance. Well, maybe you're talking about one of the cases, but the other one, and this is a newer one, instituted in 2001, but what about the one that started out in 1990? You know, Coleman is obviously a much more serious problem. I don't doubt that. And if the Court were to conclude ultimately that Coleman ought to go back for another analysis based on the problems there, I could understand that. And it would be a very different prisoner release order under those circumstances because then you'd have to take out all of the evidence with respect to PLATA and let that play out. But even that, it seems to me, would be a mistake under these circumstances where the special master and the receiver have been, in a sense, joined at the hip in a variety of ways, and it only makes sense because the receiver is controlling the provision of medical care in the CDCR, and the special master is taking care of or trying to promote a very small slice of that. So in the scheme of things, as you might expect, the receiver consistently gets the ultimate authority to make the decisions to help provide the kind of resources, both in quality and quantity and staff and construction and access to the health care. Counsel, this issue about evidence, did you proffer to the judge anywhere in this record what the additional evidence it was that you wanted to show? I know that the decrease in suicides happened post-trial, so you couldn't have proffered that pre-trial.  But you run the prisons. I presume that you could have, yourself, without discovery, set forth a proffer for the court that says, we had a wait time between diagnosis and treatment that was 60 days, 90 days, 120 days in the past, and we've reduced that down now to two weeks, or whatever the reality is. Why didn't you keep saying we were blocked? Because the district court could not have been plainer. And when the Intervenors Council stood up in the opening statement and said, I want to start talking about the beneficial changes and where the status is today as opposed to where it was way back when, the three-judge court, or at least one member of the three-judge court said, we have been as clear as we can be that we are not entertaining any evidence on that point. So the notion of coming forward with a proffer, while technically it might have been, is clearly a futile act, and we had already annoyed the judges on our side by even making reference to it. So I don't think it's an appropriate response to say that we should have put forward more, because it's because we wish we had more. But the district court invited you to proffer that evidence that went to the appropriateness of the remedy. So you didn't have to proffer it. It viewed you as saying, we're no longer violating, constitutionally violating the Eighth Amendment. Instead it said, we'll take whatever you have to proffer to show that the remedy is inappropriate. But Justice Sotomayor, there is, to my mind at least, a complete disconnect by saying, I'm not going to tell you exactly where the constitutional violation is today. We're not going to get into that. We're just going to assume there's a constitutional violation. Now, prove to me what remedy will or will not work under those circumstances. It seems to me the exact opposite is the way to do it. You determine where the constitutional violation is. I don't see your time. It's about to expire. Thank you, Mr. Chief Justice. Mr. Spector. Thank you. Mr. Chief Justice, and may it please the Court. For 20 years, the overcrowding crisis has caused prisoners suffering from psychosis and life-threatening illnesses to languish in their cells because treatment facilities have no room for them. Prisoners are committing suicide at a rate twice the national average, and more than two-thirds of those suicides are preventable. Are you talking about current figures or past figures? Tell us the date of the figures. Sure. That's from the trial court's opinion. That's what I thought. How do you address your adversary's point that the adequacy of the remedy can't be measured unless you measure the state of the situation at the time the remedy is imposed? Well, I think, Your Honor, there is massive amounts of evidence about the constitutional violations that existed at the time that the remedy was imposed. And if I can point to the jurisdictional statement, one appendix, page 30A, the Court said, nonetheless, as we described below, fundamental unconstitutional deficiencies caused primarily by overcrowding continue to exist. You didn't take any evidence on the point, I thought. No, Your Honor. I'm sorry. That's not correct with all respect. They took massive amounts of evidence up to the day of trial about all the conditions as they relate to the remedy. And those conditions were— Current conditions? Current as of the time of the trial. What was your friend talking about when he said that they rejected any effort to show the current situation? Well, my friend and I have a disagreement, but I think Justice Sotomayor accurately captured it. What the three-judge panel said is, look, we're not going to—you can't— this isn't the place for you to come in and say everything's fine, everything's constitutional. What the three-judge court did say is we will consider, and they did in fact consider all the evidence from the State. They had experts from the State tour the prisons in August of 2008. Those experts wrote reports. They testified, and they testified about the conditions current. And one of them— This was in 2008. And that was the time of the trial, Your Honor. The discovery— They had a cutoff date of some two months before the trial began. In August. And the trial started in November. And that—but before that point, the experts that testified were aware of the conditions that existed. Exactly, Your Honor. And when was the remedy imposed? The remedy—well, the final order came—well, the close of evidence was in December of 2008. That was in the one-judge court. No, no, no. In the three-judge court, the three-judge court closed evidence in December of 2008. We then argued the case after the post-trial briefing in February of 2009. Then the court came out with a tentative decision about 20 days later. And then, in August of 2009, it issued the 183-page opinion on the order. I'm sorry. Let me just keep track here. The evidence was cut off when? In 2008? The trial closed in December of 2008 after all the parties had submitted all their evidence. And there was post-trial briefing for a month. Then we had argument in February of that year. And then a few weeks later, they issued a brief summary of their conclusions in an attempt to get the State and the parties to settle. You don't dispute the statement I have. It's in the response of the interveners that between October 2006 and October 2010, the population of the adult facilities declined by 14,832 inmates? Well, I agree with my friend, Mr. Phillips, that the population has declined by about 10,000 prisoners. Most of that decline has been due to transfer to out-of-state prisons. And true, there's some amount of it that has been as a result of the marginal increase in good time credits, which the State elected to pursue on its own. What about the argument that there was evidence that should have been admitted but that was not with reference to new construction? Well, there was no evidence that wasn't considered by the three-judge panel, Your Honor. They considered all the evidence. Their 183-page opinion is scrupulous in considering all the evidence, both that supported the order and they distinguished the evidence and made credibility determinations based on the evidence that that was contrary. Can you explain what the connection is between the 137.5% figure and the constitutional violations relating to the provision of medical care in general and treatment for mental illness? My understanding of the 137.5% figure is that that has to do with the total number of prisoners in the system in relation to design capacity. Isn't that right? That's correct, Your Honor. Now, that doesn't speak to the number of personnel who are available in the system to attend to medical needs or mental illness. It doesn't speak to the extent of the facilities that are available for those purposes. There seems to be a disconnect between those two. Could you explain why that is narrowly tailored? Yes, Your Honor. There was the court-made finding that 137.5% was the maximum number of prisoners of the design capacity of the prison that the prison could house that would enable the State to have all those things that you just mentioned, staffing, facilities, medication management, be effective and reach the actual prisoners who are ill seriously. See, that's what I don't understand. Could you not have a prison where the cells are somewhat crowded? And 137.5% of design capacity is not unconstitutional in itself. No, it's a remedy, Your Honor. Or you could have a prison where the cells themselves are crowded and yet there are other facilities available for medical care and plenty of staff to attend to those things. So what's the connection? And you're right. If the cells were crowded but the prison had all the other facilities available, then there might not be a problem. I hope you can understand that. In this case, the prisons were built to double-cell the prisoners, but they weren't built to provide 200% of health care needs. So as soon as they started to double-cell these prisoners, they could meet their literal housing needs in the space of the cell, but they couldn't meet the needs of the health care, and that's why, Your Honor, the 137.5% figure is reasonable because the court went almost a third overcrowding above what all the experts recommended. Why order the release of around 40,000 prisoners, many of whom, perhaps the great majority of whom, are not going to be within a class in either of these lawsuits? Why order the release of all those people rather than ordering the provision of the construction of facilities for medical care, facilities to treat mental illness, hiring of staff to treat mental illness? Why not go directly to the problem rather than address what seems to be a different issue altogether? Well, I have two responses to that, and they're both a little separate. The first point, it's important to understand that this is not a release order. It's a population crowding reduction order. The court is not ordering the state to throw open the gates of its doors and release the people. They can reduce crowding through more transfers to out-of-state. To your construction point, if the state so chooses, it can construct new facilities to increase the capacity, and the three-judge panel said if you increase the capacity, you can increase the population. The point about if all they do is to build more cells, they're not going to address the problem. Exactly. So that goes to the second part of your question, which is why don't they try other things like ordering the prison to hire more doctors, ordering better medication management, all of those kind of things. And the answer to that is in the appendix to the appellee's Coleman brief, which lists 70 discrete orders, which the Coleman court, single-judge Coleman court, tried over a period of 15 years, which have proven singularly to be ineffective. And that's why the court analyzed all those things, the trial court analyzed all those things, and it made a finding of fact that based on the statements by the special master, by the receiver's reports, and by the general state of the horrendous conditions which we have in these prisons, that those discrete orders would not solve the problem. I mean, given the level of harm. I still don't get it. You're saying that they were ordered to do a variety of things to directly address the problem, and they didn't comply. So in order to provide some kind of a remedy, we're going to order something else that doesn't address the problem that these lawsuits aim at addressing. No, you're on to the contrary, Justice Alito. I think the court believes, based on the facts that it found, that this would be an effective remedy. All of the testimony that they heard from experts from Texas, from Pennsylvania, from Washington State, all of whom had suffered, had dealt with crowding in their prison systems, have said that when you reduce the crowding, that's the critical thing that you have to do now, because unless you reduce the crowding, nothing else is going to work. And the court found that that was exactly true. Nothing else over 20 years in one case and over 8 years in another case has worked. And as Justice Kennedy said, massive amounts of evidence show that the primary reason it hasn't worked is one singular word, overcrowding. And when you reduce overcrowding, the prison will be able to operate and will be able to provide those services that it can't provide now, so the doctors will have room to be able to work, which they don't have now. There will be less prisoners, so officers will be able to take them from one place to another to get treatment. There won't be so many lockdowns, which inhibit care. It's still a very indirect way of addressing the problem, and it has collateral consequences. If I were a citizen of California, I would be concerned about the release of 40,000 prisoners. And I don't care what you term it, a prison release order or whatever the terminology you used was. If 40,000 prisoners are going to be released, you really believe that if you were to come back here two years after that, you would be able to say they haven't contributed to an increase in crime in the state of California? In the amicus brief that was submitted by a number of states, there was an extended discussion of the effect of one prisoner release order with which I am familiar, and that was in Philadelphia. And after a period of time, they tallied up what the cost of that was, the number of murders, the number of rapes, the number of armed robberies, the number of assaults. That's not going to happen in California? Your Honor, this trial court found, based on 50 pages of its opinion, based on expert testimony, not only from our experts, but from the state's experts, from the intervener's experts, they all came to the unanimous conclusion that there are methods by which you can reduce crowding, which will not increase crime in our state. The Secretary of the Department of Corrections, who was the Secretary at the time of trial, so testified that he was in favor, for example, of increasing prisoners' good time credits. That's one way to reduce crowding. And moreover, there was statistical evidence looking at all the other states that had reduced their prison population over a period of about 15 years, and they all came to the same conclusion. All of those studies came to the same conclusion, which is there is no increase in the crime rate. But that is not what the three-judge district court determined. The Prisoner Litigation Reform Act requires that court to give substantial weight to adverse impact on public safety. And then it said to the state, look, you come up with a plan that gets you to 137.5 in two years. Yes, Your Honor. The state did, and the state did not say, emphatically did not say, this is not going to have an adverse impact on public safety. Right. Follow the double negative there. And what the district court said, it didn't examine it. It said, well, we're sure the state's not going to do anything that has an adverse impact on public safety. I'm looking at page 4A of the jurisdictional statement. And so it did not make those determinations, but the PLRA requires it to determine that what it's ordering or at least give substantial weight to the public safety issue. So isn't that a basis for overturning the remedy that's imposed here? I respectfully disagree with that. I thought you would. At least it's respectful. I'll tell you why I think that. The court examined all of the methods that are commonly used and that the Governor himself has proposed to reduce crowding. The Governor himself wanted to reduce the prison population by 37,000. That was in one of his legislative enactments, and the Secretary of Corrections testified that those proposals were safe. Did he want to do it within the two-year period the district court ordered? Yes, Your Honor, he did. He submitted legislation to the legislature for that, and the legislature wouldn't take it. And the Governor actually said, reacting to that, after a riot at Chino, which was one of the Chinos of prison in California, a riot, he said, and the politicians in Sacramento have swept the problem under the rug. Right. Now, my question is specifically with respect to the two-year plan, and I'd like an answer to that. Yes. Because as I look at this record, I don't see that the district court did what was required by the Act with respect to the plan that it's ordering. It just simply said, oh, I'm sure the State wouldn't do anything to hurt public safety. After telling the State, you've got to give me a plan in two years that gets to 137.5. Right. Well, I think all of them — it didn't analyze the plan because the court was trying — well, there was no plan. The court — what the court did was it said, we want to give the State the maximum flexibility, for comedy reasons, to determine how best to remedy the constitutional violations. Now, I'm certain — and they said — they also said that we're sure the State can do it in a safe way. But it's not — They said we're sure because we trust — I'm just quoting from 4A — we trust that the State will comply with its duty to ensure public safety as it implements the constitutionally required reduction. The State is saying it cannot meet the 137.5 in two years without an adverse impact on public safety. Right. And that's the State's position. It had been the State's position all along. The court's findings that a population reduction of this magnitude were clear and they're not shown to be clearly erroneous here. The court said point-blank that we're — it's our finding that the State can reduce the population to its current levels — from its current levels to 137.5 safely. They made that finding. Counsel, isn't the court — It hasn't been shown to be clearly erroneous. So they didn't have to look at particulars. In an effort to give the State the maximum flexibility, they wanted to allow the State to choose the methods that it wanted. If the State — They can do it. Of course they could do it safely if they built, you know, umpteen new prisons. But they can also do it safely — But that's pie in the sky. That's not going to happen. No, it isn't, because they can also do it safely by good time credits. They can do it safely — Doesn't good time credits let people out who would not otherwise be out? Just a — you know, the evidence was, the trial and the court's finding about that evidence was, and the State officials so testified that giving prisoners good time credits is not a threat to public safety. Counsel, why wouldn't it have been better, of course, for the State — excuse me, for the court to say, you know, the State says it can do this in five years? Right. Without any public safety problem. So why don't we let them take those five years? Because, Your Honor, as Justice Ginsburg and others have been saying before, the constitutional violations have been ongoing for 20 years. We're dealing here with cases of life and death and serious injury. And after all these years, when they heard the evidence that said that population could be — and they made the findings, which the State doesn't argue are clearly erroneous. When they made those findings, that it could be reduced safely, they had an obligation to provide a remedy that would provide constitutionally adequate care in the safest manner possible — in the quickest manner possible. I think Justice Sotomayor has been patient here. Not in responding to the Chief Justice. Didn't the district court discuss different safe ways of reducing the population? Yes. And said, we're not imposing them because we want the State to do — to choose among them. Yes, Your Honor. As I've looked at the State's final plan, I thought that they had, in fact, not only accepted all of the recommendations, but they added a couple of additional remedies that the court had not suggested. Yes, Your Honor. Is it a fair statement that the district — that the three-judge panel was saying, if you do these things, that's their finding? Never. You could do it without affecting public safety? Wasn't that what they were saying? Yes, Your Honor. If I didn't make that clear, I meant to. Well, the second and more important question is going back to something that Justice Scalia asked you, which was, you made the statement that no one was stopped from offering evidence about prison conditions up until two months before the trial. So what evidence was excluded? Nothing. Nothing. What point is the other side making that they were excluded from making? Well, as we said in our briefs, Your Honor, there was no evidence that was excluded. And, in fact, the State's witnesses testified about conditions — some of the conditions current as of the day of the testimony. So it was very current. Nothing was excluded. Well, then, in my view, the other side of the coin, as I said, had to be a little more restrictive. Is that why, even if the Court made a ruling which was error, which we don't believe it was, there was absolutely no prejudice? What is the number of — I was puzzled about the same thing that Justice Sotomayor was. I read on page 253 of the appendix a conclusion where the district court said it is our conclusion that they can reduce this by how many people? What is it, 30,000? That's a lot. Thirty-five thousand. Thirty-five thousand. That this can be done safely. Yes. Preceding page whatever that was, 253. Right. There are about six pages where they summarize evidence from all kinds of criminologists that say, for example, there are 17,000 technical parole violators that are being sent to prison who haven't committed additional crimes, and they could perhaps be released from some of the time that they're spending in prison. Then they go on to this good time, which would, I guess, lead to people who are 50 years old or 60 years old, who've been in prison for 40 years, would be released at age 55 instead of age 75. I guess there's some category there. Yes, Your Honor. And they had several other things. Okay. Now, what are some facts about that? And there was also testimony that the Department of Corrections was using a risk assessment instrument to identify the low-risk prisoners. Isn't it true that one of the main programs that was cited as providing a safeguard is evidence-based rehabilitation programs? Yes, Your Honor. All the witnesses from the State, the intervenors, the local witnesses, our experts, they all found that those would help reduce crime and that they would be most effective if used in a community, but they would be effective also if they were in the community. And what's the general record of the success of rehabilitation efforts? Well, you can't say generally because different programs have different records. What did Congress think when it enacted the Sentencing Reform Act? I don't know, Your Honor. I have this question, and it goes just to remedy. Recognize the district court has to be given considerable discretion. It shows the 137.5 figure because it's halfway between 145 and 130. That's right. I think that certainly the Prison Litigation Reform Act means that you have to, if there's going to be a release order, it must be releasing the minimum amount that will affect the purposes of the remedy order. There was substantial expert opinion that 145, 145 percent, would be sufficient. Doesn't the evidence indicate to you that at least 145 ought to be the beginning point, not 137.5? And I understand there were more, correct me if I'm wrong, there were more experts that testified that 145 would work than there were that 130 was necessary. No, I respectfully disagree with the record, Your Honor. The 145 figure came from a report by the former governor, Duke Majan, and a group that he organized, and they said that they could operate a crowded system at 145 percent of capacity. And that figure was high that the district court found because it didn't take into account health care needs. And it didn't take into account health care needs, which is the issue here. And our experts testified that because it didn't take into account health care needs, 130 percent was the better number. It's the number that the strike team had thought of, the administration's own strike team. It's the number that these professional experts believed would be sufficient to remedy the population. And back to my answer to Justice Alito's question is, the health care facilities themselves were built to provide services to only 100 percent, health care services to only 100 percent of the prisoners. But the experts that were testifying were quite aware of the fact that overcrowding related to the constitutional violations. That was their whole theory. Yes. And any number of them suggested that 145 would be sufficient. I think there might have been only one expert who suggested 145. I think most, the majority of the experts, suggested 130. The Court found, and it's not been challenged here as clearly erroneous, that the weight of the evidence went to 130. They wanted to do what you're saying, which was minimize the intrusion, maximize the population. So even though the Court had ample basis to issue an order saying it should be 130, they said in an abundance of caution and to give the State the benefit of the doubt and to make sure, we're going to bump it up an extra 7.5 percent. I see no evidence in the record that the State's, that, pardon me, that your clients said that 145 wouldn't work. I think. Maybe you can answer. Did the experts say. Maybe you can answer, counsel, please. Thank you. My recollection of the testimony was that our experts said it had to be down to 130 in order for the other remedies to be effective, Your Honor. The expert who gave the 145. Pardon me? The expert who gave the 145. There was no expert. Well, there's one expert who said maybe in the best of circumstances it could get to 145. All the others talked about 130 percent. Let's go to the one who's used the 145 figure. Right. He was a psychologist, Your Honor. He was a what? He was a psychologist who has expertise in prison health care. And did he say that at 145 you could deliver health care safely? He was equivocal on that point. He thought, he said that at the outer reaches it might be true. But I want to emphasize that the district court has allowed the State to come back in at any time to modify its order and to modify this percentage point if the circumstances change. Mr. Suspect, there has been at least two significant changes. One is the good time credit. The California legislature did pass a law that ups the good time credit and also addressing the probationers and the parolees who were technical violators to divert them from the system. Do you have any information about what effect that legislation was passed January? It was passed, I think, last year. I think it went into effect in July of last year, I believe, if that's what you're referring to. So do we know at all what effect it has had? It has had a marginal effect on reducing the population. There have been no reports that it has led to an increase in crime. But to get back to my earlier point and your point, Justice Kennedy, about the remedy and that it should be the least intrusive possible, this order is set to take effect over a two-year period. And during that two-year period, if Mr. Phillips is correct that the conditions are constitutional and that they can deliver services at 145 percent, then the State is free to come in and make a motion to bring those changed circumstances to the court. And if anything, this Court has been incredibly sensitive to the needs and desires of the State. And it was extremely reluctant to end this order in the first place and would bend over backwards to give the State discretion while bringing it to pass. I don't see a finding by the three-judge court that 145 assistance would not be an efficacious remedy. I know that it went for 137. Yes, Your Honor. I don't think it's explicitly said 145, but I think it discussed the 145 figure in the context of the fact that it didn't provide for health care services. So it discounted that a little bit and went down about 7 percent. But it came close to that figure, I believe. Can I ask you a hypothetical question that I know is not your case? But let's say you had the district court entering an order saying you have to bring it down to 137.5 in two years. That will, as a practical matter, result in the release of 40,000 prisoners. The State comes back and makes a showing supported by experts saying, look, if you give us four years, we can reach the figure without releasing any prisoners. Do you think it would violate the Prison Litigation Reform Act for the district court to say, no, I want this done in two years, not four years? And we just have to deal with the fact there are going to be 40,000 prisoners out on the streets. Well, the Prison Litigation Reform Act requires the court to give substantial weight to the public safety implications of its decision. So under those circumstances, under those hypothetical circumstances, there's always the possibility that in those cases the degree of public safety problems might outweigh the harm. As you said, that's not this case. They found that we could do it. And the three-judge panel found that the State could reduce the population safely. And there was no suggestion in the record that this two- or four-year period would make that much of a difference. You have to put the 40,000 or 35,000 figure in context. California releases 120,000 prisoners every year on parole. That's a lot of prisoners. And the findings of the district courts are even when California increases the number of parolees in the communities, that doesn't increase the crime rate. What's the recidivism rate for those parolees? Well, it depends on the risk of the parolees. The high risk — In general, what is the recidivism rate? Well, overall, the risk is around 70 percent. But for low-risk prisoners, the risk is 17 percent who we violate. I'm sorry, I couldn't — what was the first — The first number when you take all parolees all together, it's 70 percent. Seven-zero. Seven-zero. Because within three years. That's what the situation we have now, and that's the situation that the governor, the secretary, the court described as a failure. With parole reform, you could reduce that number in many ways, and the court described how you could do that. But for the low-risk prisoners, it's 17 percent? 17 percent. And California has a risk assessment instrument, which the court found could be used to make sure that what happened in Philadelphia doesn't happen again. Well, that's because of the low risk. If only the low-risk people are released, around 3,000 of them are going to commit another crime. But they don't have to be released. First, I want to make sure I emphasize the point that this is a crowding reduction measure. You don't have to release 35,000 prisoners. They don't have to be released if you can build enough cells. Or you can improve the parole system so that parole violators don't commit so many crimes if you offer rehabilitation alternatives, if you provide a number of diversion into the community. There are a number of other options short of releasing prisoners. And the 17 percent figure goes to exactly my concern. This is going to have, it seems likely this is going to have an effect on public safety. And the experts can testify to whatever they want. But you know what? If this order goes into effect, we will see. We will see. And the people of California will see. Are there more crimes or are there not? Well, based on the experience in other jurisdictions, the court found we wouldn't. And I want to just say, I want to clarify one point, Your Honor. The 70 percent figure includes, doesn't it always include crimes? It includes lots of technical parole violators, people who've missed their appointments, for example. So it's not as grave as some of the figures that have been thrown by the other side. Is there any likelihood? Is there any other case where the prison reduction has been done under the PLRA or is this the first one? The first one to reach this Court, obviously. There have been a few others that have been resolved by consent, as I understand it, or not appealed. But just a few. Is there any evidence on the – I see the suggestions that the technical parole violators go elsewhere, that the elderly and infirm prisoners, some of them be released, that good time credits for older people where it would have effect be increased, and also halfway houses and other kinds of prison facilities, which used to be called less physically restrictive punishments, or taking the money you save and building new prisons? Okay. That seemed to be the gamut. Is there any evidence, statistically or otherwise, because it used to be that states did rely on halfway houses that relied upon – and some of them were pretty tough, and there were a whole range of what used to be called intermediate punishments. Yes, Your Honor. All right. Is there any statistical evidence on the part, on the point that Justice Alito raised, Yes, Your Honor. as to whether these did or did not result in higher crime rates? Well, the evidence was, and the Court found, and again it's not clear error, that these programs were not – were more effective than prison in reducing recidivism, and they were less expensive. And that's part of the reason why the three-judge panel concluded that a reduction in the prison population would increase crime. Counsel, one of the things that concerns you about this type of institutional reform litigation is that the state's responsible for a lot of different things. Yes, Your Honor. What happens when you have this case, another district court ordering the state to take action with respect to environmental damage, another court saying you've got to spend this much more on education for disabled, another court saying you've got to spend this much more on something else? How does the state sort out its obligations? Does it say, well, I'll spend more money to build prisons, but I'll violate this other district court order saying I have to spend more money to build water treatment plants? Well, Your Honor, in this particular case, I know you like your particular case, and you want the state to say this is where I'm going to put my money. But the point is it's a budget prioritization that the state has to go through every day, and now it's being transferred from the state legislature to federal district courts throughout the state. Well, I believe the federal courts have an obligation to enforce the Constitution and the laws. No, no, I believe that as well, Counsel. What I'm saying is that you have conflicting orders from different district courts telling them you've got to comply with the Constitution by spending $8 billion here and another court saying I've got another constitutional problem of my own and you've got to spend $8 billion over there. What is the state supposed to do in that situation? Well, my simple answer to your question, Your Honor, and I don't mean to be flippant, but they have an obligation to follow the federal law, constitutional law, and other laws. And if they're not, then the federal court has an obligation to impose a remedy. In this particular case, the state has a choice. It can either incarcerate 140,000 prisoners in a system built for 80,000, or it can incarcerate a lesser number. If it chooses to incarcerate 148,000 prisoners in a space built for 80,000, it's going to incur certain obligations. And we believe, as I said in answer to Justice Breyer's question, the state could choose to use less restrictive punishments, alternative punishments, get a better bang for their buck, have more public safety, but if the court imposed that kind of a rule, then the state would be here saying it's violating comedy provisions and making policy choices for the state, which it shouldn't. I believe in this case the court gave the state the maximum degree of flexibility to make all the policy choices surrounding the incarceration of these prisoners. The Constitution prevents the state from incarcerating somebody and then not providing them the basic medical care they need to escape from the prison and not die before their sentence is out. And that's what we have here. Thank you. If you take the state's concession that it can meet a goal in five years and the federal court order is two years, we're talking about three years. Is there any indication of how fast the state's remedy would click in? Are we talking maybe about a 5 percent differential for the last three years? Well, there are a lot of things the state can do quickly. For instance, it can reform its parole system. It cannot reincarcerate technical parole violators. No, no, I'm saying, compare what the state concedes that it will do with what the court has ordered it to do. I just want to remind you that the governor proposed to the legislature that he reduce the prison population. He said it could be done safely by the same amount, roughly 37,000 prisoners, in two years. So what the court found was basically what the governor had believed was safe. The five-year period is longer, and the five-year period is longer because it takes time to construct the facilities that the state wants to construct. I believe that's the major difference between the two remedies. But the other methods, the good time credits, parole reform, diversion, those can be implemented very quickly, and those substantial reductions can be accomplished safely in that amount of time. So should the court have said two years for everything but construction? Wouldn't that have been a more narrowly tailored remedy? Except that there was going to be no construction adequate because there was no money. Right, and the state has not really put up the money to construct those new prisons. This case has been ongoing since 2006, and they've hardly constructed anything. Even if there was a more narrow remedy, the court found that construction wouldn't be a viable alternative. My time is up. Thank you, counsel. Mr. Phillips, you have three minutes left. Thank you, Mr. Chief Justice. Just a few points. First of all, with respect to the state of the record and what was proffered and what was not proffered, if you look at the Joint Appendix of 2085, there's a specific proffer that is made by the intervenors in that context. I'm sorry, there's a specific proffer made by the state of the 2085. That's Volume 6 of it. And it's at that point where the intervening plaintiffs say, we'd like to put on evidence the constitutional violations. And Judge Carlton says, twice this court has said, we will not receive that evidence. You've made as clear a record as you can. Please don't waste our time. And then later at 2338, which is again in Volume 6, where we enter Mr. Dezember, who's the Assistant Secretary of CDCR in charge of health care. He specifically says, I've read the December declaration, and it will not be received to the extent that it says the State is in compliance. So we've made our efforts. I'm sorry. We were rebuffed. I don't know what the declaration said. Is the actual declaration in the record somewhere? Yes. I believe the actual declaration is in the record. All right. Mr. Folks, sorry, but on a different subject. Does the State stand by its representation that it can do this without any public safety impact in five years? Yes. I mean, we made that submission to the court, and we believe that we could comply with it. That's it. That stands true. Notwithstanding budget, economic differences, budget differences. I mean, the Plaintiffs' Council talks about all of the things that you can do, and if you look at 70A of the jurisdictional statement appendix, it specifically says there's a line. Above the line we can implement, and that will get you about 16,000 inmates, and below the line you need legislation in order to implement these things. But the reality is that any time you say you're going to release 30,000 inmates in a very compressed period of time, I guarantee you that there's going to be more crime and people are going to die on the streets of California. I mean, there's no way out of that particular box. But if there were five years, you think you could do it without any public safety impact in the way that you told the court you could? I think so, but I'm still concerned because the district court in this specific sense, we have said we have not evaluated the safety impact of each of the elements of the State's proposed plan, and it seems to me they had an obligation to do that. The other point I want to make with respect to Justice Kennedy's question is that there is not a shred of evidence that 137.5 makes any sense whatsoever. That is a pulled-out-of-the-air number. Theirs was aspirational. None of that is based on what is the constitutional violation that exists at the time you adopt that particular percentage. It seems to me that's the entire problem of this exercise, which is to say we're going to fix this across the board rather than what would make much more sense, which is to evaluate these matters facility by facility, to evaluate these matters on the basis of the various discrete elements of how you can reduce the prison population and to do it in conjunction with a receiver who is in place, who can help to implement this in a very systematic way and that will get us to where we want to get to. So why didn't you give the court that as your plan? The court gave you absolute discretion to implement the plan that you wanted. It said we don't want to do facility by facility because we want you to figure out where you need to implement. So your plan didn't do that well, either in your five-year plan or in your two-year plan. Because the district court's order said you're going to have to reach 137.5 percent in two years, period. That's the categorical rule. And the first time we went in to suggest something above 137.5, Judge Henderson said, I'm not hearing that. Thank you, counsel. Mr. Phillips, Mr. Spector, the case is submitted.